## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEREK SLAUGHTER,<br>GABRIEL CAMPANA, and<br>CITY OF WILLIAMSPORT, | No. 4:21-CV-01284<br><br>(Chief Judge Brann) |
| Plaintiffs, | |
| v. | |
| THE CHARTER OAK FIRE<br>INSURANCE COMPANY, STATE<br>NATIONAL INSURANCE<br>COMPANY, INC., and STEVEN<br>HELM, | |
| Defendants. | |

### MEMORANDUM OPINION

### JUNE 17, 2022

Switching insurance providers can prove tricky. The separate insurance policies—drafted by, and entered into with, different providers—may not necessarily align, creating gaps in coverage that can leave even the best-intentioned policyholders entirely exposed.

That, unfortunately, is where the City of Williamsport now finds itself. The City switched providers for its public entity liability insurance in January 2019. It was then sued in 2021 by a police officer who claimed retaliation based on prior suits he filed against the City in 2017 and 2018. Accordingly, the officer filed the prior suits during the coverage period of the City's former insurer, State National

Insurance Company, Inc.; he filed the 2021 suit during the coverage period of the City's current insurer, The Charter Oak Fire Insurance Co. But the current insurer disclaims coverage for claims in any way factually connected to prior suits filed outside its coverage period. The former insurer does not follow this same practice, and, critical here, disclaims any obligation to defend or indemnify the City for any future claims arising out of pending or prior litigation.

Read together, the Charter Oak and State National insurance policies leave the City out of luck: despite maintaining public entity liability insurance without interruption, the City has no coverage for the officer's 2021 suit. For the reasons provided below, the Court denies the City's motion for judgment on the pleadings and grants Charter Oak's and State National's cross motions seeking the same.

## I.  BACKGROUND

### A.  The Underlying Complaint

On April 15, 2021, Steven Helm, a Lieutenant in the Williamsport Police Department, sued Williamsport and its current and former mayors, Derek Slaughter and Gabriel Campana, alleging violations of his First Amendment right to freedom of speech.[1] According to Helm, between December 2018 and December 2020, he was repeatedly denied promotions within the Police Department because of prior lawsuits he filed against the City.[2]

---

[1]   Doc. 1-1 ¶ 19; *see also* Doc. 24-1, Ex. A (Apr. 15, 2021 Helm Complaint).
[2]   Doc. 24-1, Ex. A (Apr. 15, 2021 Helm Complaint).

Specifically, Helm sued Williamsport and its Police Chief in April 2017 for violating his First Amendment freedom of association rights by allegedly retaliating against him for his activities as the president of the police officer's union.[3] Helm then filed a second, one-count suit in November 2018, raising the same claim based on similar conduct.[4] Ultimately, Helm and Williamsport resolved these suits by settlement agreement.[5]

But by filing these lawsuits, Helm claims, he became a marked man. After the Williamsport Police Chief announced his retirement in the fall of 2018, Mayor Campana refused to elevate Helm to that position.[6] Campana then repeatedly rejected efforts to install Helm as the Assistant Chief.[7] And after Slaughter became mayor in January 2020, he followed his predecessor's lead and refused to promote Helm to Assistant Chief or to Captain of the Patrol Division.[8] In Helm's telling, current and former officers in the Police Department thought it was "obvious" that Helm should have been named Chief in December 2018 and that he "was the most qualified person for the [Assistant Chief and Patrol Division Captain] positions without a doubt."[9] But the mayors of Williamsport would have none of it; they

---

[3]   *Id*. ¶¶ 11–12.
[4]   *Id*. ¶ 13.
[5]   *Id*. ¶ 14.
[6]   *Id*. ¶¶ 15–20.
[7]   *Id*. ¶¶ 21–30.
[8]   *Id*. ¶¶ 33–55.
[9]   *Id*. ¶¶ 18, 54.

"would not promote [Helm]   . . . because [he] had filed lawsuits against the City."[10]

### B.   The Insurance Policies

To safeguard the City's finances from employee lawsuits like those filed by Helm, Williamsport maintains public entity liability insurance that covers, among other things, losses resulting from "wrongful employment practice[s]."[11] From January 1, 2016, to December 31, 2018, the City contracted with State National for this coverage.[12] Under its public entity liability insurance policy, State National committed to "pay on behalf of [Williamsport] all 'loss' resulting from 'employment practices wrongful act(s)' but only with respect to 'claims' first made against [Williamsport] during the 'policy period.'"[13] Further, State National assumed "the right and duty to defend any 'suit' against [Williamsport] even if any of the allegations of the 'suit' are groundless, false or fraudulent."[14] That said,

---

[10]   *Id*. ¶ 19; *see also id*. ¶¶ 61 ("The speech contained within [Helm's] prior lawsuits against the City and his Supervisors was a substantial or motivating factor in Defendant Campana's decision not to promote [him] to the position of Chief."), 76 ("The speech contained within the lawsuits filed by [Helm] . . . was a substantial or motivating factor in the retaliatory act of refusing to consider [him] for the positions of Assistant Chief and/or Captain.").

[11]   Doc. 1-1 ¶¶ 7–9, 12–14.

[12]   *Id*. ¶ 7; *see also* Doc. 8-1, Ex. A (2016 State National Policy); Doc. 8-2, Ex. B (2017 State National Policy).

[13]   Doc. 8-1, Ex. A (2016 State National Policy) at 109. The policy defines "employment practices wrongful act(s)" as "[a]ny actual or alleged: (a) [r]efusal to employ; (b) [t]ermination of employment; or (c) [f]alse arrest, false imprisonment, libel, slander, defamation, harassment, humiliation, discrimination, invasion of privacy, wrongful eviction, malicious prosecution, abuse of process, or any other act, omission or policy; based upon or attributable to anyone's employment or application for employment by you." *Id*. at 112.

[14]   Doc. 8-1, Ex. A (2016 State National Policy) at 109.

State National disclaimed any "obligat[ion] to make any payment [or] to defend any 'suit' in connection with . . . future 'claims' arising out of any pending or prior litigation or hearing."[15]

After its agreement with State National expired in December 2018, Williamsport switched insurers.[16] The City contracted with Charter Oak for public entity liability insurance, with coverage beginning on January 1, 2019, and continuing through the present.[17] As with State National, Charter Oak agreed to provide coverage for "damages because of 'employment loss' . . . caused by a 'wrongful employment practice offense'" and to "defend [Williamsport] against any claim or 'suit' seeking those damages."[18]

Relevant here, Charter Oak's coverage extends only to suits "first made or brought against [the City] . . . during the policy period."[19] And the Charter Oak policy contains an important qualifier regarding the concept "first made or brought":

> All claims or "suits" that seek damages because of "employment loss" caused by the same "wrongful employment practice offense" or "related wrongful employment practice offenses" will be deemed to have been fist made or brought against [Williamsport] at the

---

[15] *Id*. at 109–10**.**
[16] Doc. 1-1 ¶ 11.
[17] *Id*.
[18] Doc. 1-4, Ex. 4 (2021 Charter Oak Policy) at 30.
[19] *Id*. at 30–31.

> time the first of those claims or "suits" is first made or
> brought against any insured.[20]

The Charter Oak policy defines "related wrongful employment practice offenses" as "two or more 'wrongful employment practice offenses' that have as a common connection, tie or link any fact, circumstance, situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions or causes."[21]

### C.   Procedural Posture

The City of Williamsport initiated this action on June 22, 2021,[22] asking the Court of Common Pleas of Lycoming County, Pennsylvania to declare that Charter Oak and State National are required to defend and indemnify the City against Helm's April 2021 suit.[23] The Defendants removed the action to federal court shortly thereafter.[24] On August 15, 2021, Williamsport filed a motion for judgment on the pleadings,[25] and the Defendants responded in kind, filing cross motions in

---

[20]   *Id*. at 31.
[21]   *Id*. at 40**.**
[22]   As they are named defendants in the April 2021 Helm lawsuit, Mayors Slaughter and Campagna are also plaintiffs in this case. For ease of reference, in the remainder of this Memorandum Opinion, the Court refers to the Plaintiffs collectively as "Williamsport" or the "City."
[23]   Doc. 1-1.
[24]   Doc. 1.
[25]   Doc. 14.

November and December.[26] The motions have been fully briefed and are now ripe for disposition.[27]

## II.   LAW

When considering a motion for judgment on the pleadings, courts use the same standard employed when it is considering a motion to dismiss for failure to state a claim.[28] Therefore, a court assumes the truth of all factual allegations in the plaintiff's complaint and draws all inferences in favor of that party;[29] it does not, however, assume the truth of any of the complaint's legal conclusions.[30] If a complaint's factual allegations, so treated, state a claim that is plausible—i.e., if they allow the court to infer the defendant's liability—the motion is denied.[31] If they fail to do so, the motion is granted.[32]

## III.   ANALYSIS

In its motion for judgment on the pleadings, Williamsport asks the Court to declare that both Charter Oak and State National possess two distinct but related duties: (a) the duty to defend the City in the lawsuit Helm initiated in April 2021;

---

[26] Doc. 23 (State National Cross Motion for Judgment on the Pleadings); Doc. 25 (Charter Oak Cross Motion for Judgment on the Pleadings).

[27] *See* Doc. 15; Doc. 20; Doc. 24; Doc. 26; Doc. 27; Doc. 28.

[28] *Huertas v. Galaxy Asset Management*, 641 F.3d 28, 32 (3d Cir. 2011).

[29] *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[30] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Connelly v. Lane Construction Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

[31] *Iqbal*, 556 U.S. at 678.

[32] *Id.*

and (b) the duty to indemnify the City for any losses stemming from the April 2021 suit.[33] The Court addresses each duty in turn.

## A.      Duty to Defend

Under Pennsylvania law, determining whether an insurer has a duty to defend its insured involves a two-step inquiry. First, the reviewing court must endeavor "to ascertain the intent of the parties as manifested by the language of the written instrument,"[34] which requires reading the policy as a whole and construing the contract "in accordance with the plain meaning of terms."[35] The court must enforce language that is clear and unambiguous; if language is ambiguous, it must be construed against the insurer and in favor of the insured.[36]

Once the court determines the scope of coverage, it turns to the complaint in the underlying action and assesses whether that complaint triggers coverage.[37] Under Pennsylvania law, the court conducts this inquiry by apply the "four-corners" rule—that is, the court "compare[s] the four corners of the insurance contract to the four corners of the complaint,"[38] and holds that "[a]n insurer is

---

[33]   Doc. 15.

[34]   *American Automobile Insurance Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011); *see also General Accident Insurance Co. of America v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997) ("A court's first step in a declaratory judgment action concerning insurance coverage is to determine the scope of the policy's coverage.").

[35]   *Murray*, 658 F.3d at 320.

[36]   *Id*. at 321.

[37]   *Kvaerner Metals Division of Kvaerner U.S., Inc. v. Commercial Union Insurance Co.*, 908 A.2d 888, 896 (Pa. 2006) ("It is well established that an insurer's duties under an insurance policy are triggered by the language of the complaint against the insured.").

[38]   *Lupu v. Loan City, LLC*, 903 F.3d 382, 389 (3d Cir. 2018) (quoting *American and Foreign Insurance Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526, 541 (Pa. 2010)).

obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy."[39]

Because the duty to defend is a contractual obligation that stems from a particular insurance policy, this Court assesses Charter Oak's and State National's policies individually.[40]

### 1.   Charter Oak

Williamsport argues that Helm's 2021 lawsuit—which "asserts causes of action for retaliation against and failure to promote Helm because of his exercise of his First Amendment rights"—triggers the Charter Oak policy's coverage of "wrongful employment practice offenses" for claims first made or brought during the coverage period starting in January 2019.[41] Charter Oak responds that Helm's 2021 claims do not trigger coverage because they fall within an enumerated exception. In Charter Oak's view, its policy disclaims coverage for suits involving "related employment practice offenses" first brought prior to the coverage period, and Helm's 2021 suit involves "wrongful employment practice offenses" related to the prior suits Helm brought against Williamsport in 2017 and 2018—before Williamsport contracted with Charter Oak for public entity liability insurance.[42] The Court agrees with Charter Oak.

---

[39]  *Jerry's Sport Center*, 2 A.3d at 541 (citations omitted).
[40]  *See Allen*, 692 A.2d at 1095.
[41]  Doc. 15 at 8–9.
[42]  Doc. 20 at 13–20.

As noted, Charter Oak's policy establishes a duty to defend claims or suits seeking damages for wrongful employment practice offenses—such as discrimination, retaliatory action, and wrongful failure to promote—that were "first made or brought" during the policy period (i.e., starting January 1, 2021).[43] On first blush, this language appears unambiguous and its effect beyond dispute: the policy covers Helm's 2021 claims. But when reading contracts, parties (and courts) must be mindful of the fine print. And here, the Charter Oak policy contains a series of cascading definitions that materially reduce the scope of its coverage.

First, the policy provides that "[a]ll claims or 'suits' that seek damages because of 'employment loss' caused by the same 'wrongful employment practice offense' or 'related wrongful employment practice offenses' will be deemed to have been first made or brought against [Williamsport] at the time the first of those claims or 'suits' is first made or brought against any insured."[44] Put differently, a suit filed within the coverage period does *not* trigger coverage if a separate suit involving "related" wrongful employment practice offenses was "first made or brought" prior to the coverage period. Here, as Williamsport acknowledges, "Helm's [2021] claims allege that the previous litigation[s] [filed in 2017 and 2018] act[] as the reasoning for [Williamsport's] actions."[45] The 2017 and 2018

---

[43]   Doc. 1-4, Ex. 4 (Charter Oak Policy) at 30–31, 40; *see also* Doc. 1-1 ¶¶ 11 ("Williamsport contracted with Charter Oak for public entity liability insurance . . . beginning on January 1, 2019.").

[44]   Doc. 1-4, Ex. 4 (Charter Oak Policy) at 31.

[45]   Doc. 15 at 9.

lawsuits were indisputably "first made or brought" prior to the Charter Oak

coverage period. The question, then, is whether the 2017 and 2018 lawsuits involve

wrongful employment practice offenses "related" to those in the 2021 action.

Second, the Charter Oak policy defines "[r]elated wrongful employment

practice offenses" in exceedingly broad terms:

> [T]wo or more "wrongful employment practice offenses"
> that have as a common connection, tie or link any fact,
> circumstance, situation, event, transaction, cause, or
> series of related facts, circumstances, situations, events,
> transactions or causes.[46]

Per this definition, any factual commonality between Helm's 2017 and 2018

lawsuits and his 2021 claims renders the suits "related."

Notwithstanding the breadth of this definition, Williamsport argues that "the

fact pattern in [Helm's] new claim is distinct enough from the previous litigation[s]

to the point that [they] cannot be seen as related."[47] Specifically, Williamsport

asserts that Helm's 2017 and 2018 lawsuits have been settled, and "[t]here are new

acts that Helm alleges have occurred in the years following settlement of his

previous claims which obviously cannot be the same acts forming the basis of

those claims."[48] The Court finds these arguments unpersuasive.

---

[46] Doc. 1-4, Ex. 4 (Charter Oak Policy) at 40.
[47] Doc. 15 at 9.
[48] *Id*. at 9–10.

As both parties acknowledge,[49] Helm's 2017 and 2018 lawsuits serve as the predicate for his 2021 claims.[50] The Court agrees with Charter Oak that Helm "connects the retaliatory actions occurring between 2018 and 2020 [i.e., the basis of his 2021 claims] to the retaliatory actions against him referenced in [the 2017 and 2018 lawsuits]," thereby establishing "a common connection and link of related causes, facts and circumstances."[51] Accordingly, per the Charter Oak policy, these lawsuits involve "related wrongful employment practice offenses."[52]

Moreover, Williamsport offers no explanation as to why the status of the prior lawsuits or existence of additional facts underlying the 2021 suit nullifies or voids this "common connection and link."[53] There is nothing in the Charter Oak policy itself indicating that either the settlement of prior cases or the emergence of additional facts severs the relationship between otherwise "related wrongful employment practice offenses."[54] Indeed, the concept of "related" offenses that share "any" fact or series of related facts implies that the separate suit will differ in some material respect—the term, as defined, does not require perfect symmetry.

And this reading of the policy language comports with the case law. For example, in *City of Maplewood v. Northland Casualty Co.*, the court considered a

---

[49]  *See* Doc. 15 at 9; Doc. 20 at 14–15.
[50]  Doc. 24-1 (Apr. 15, 2021 Helm Compl.).
[51]  Doc. 20 at 14–15.
[52]  Doc. 1-4, Ex. 4 (Charter Oak Policy) at 40.
[53]  *See* Doc. 15 at 9–10.
[54]  *See* Doc. 1-4, Ex. 4 (Charter Oak Policy) at 31–40.

substantially similar suit involving a city seeking insurance coverage for an employment discrimination claim filed in 2006 by a former police officer alleging retaliation for "complaining of discrimination"—specifically, in 2004, the officer filed a separate lawsuit alleging discrimination.[55] The insurance company argued that its policy precluded coverage: although the city properly notified the insurer of the claim within the policy period, which began in July 2005, the policy excluded any claim "alleging, based upon, arising out of or attributable to any prior or pending litigation . . . filed on or before the effective date of the [insurance] policy" or the "same or substantially the same wrongful act, fact, circumstance or situation underlying or alleged therein."[56] The court agreed with the insurer, holding that even though the officer voluntarily dismissed the 2004 lawsuit, the 2006 claims were "based upon and [arose] out [of] the prior claims of discrimination" and "the same or substantially the same wrongful act, fact, circumstance or situation that was at issue in the prior litigation."[57]

Williamsport attempts to distinguish *City of Maplewood* without success. First, Williamsport notes that the 2006 lawsuit against Maplewood "included multiple of the same claims from the [2004 suit], along with some new ones."[58] Although true, this is of no consequence. In *City of Maplewood*, the city only

---

[55]  2012 WL 2838219, at *5–8 (E.D. Mo. July 10, 2012).
[56]  *Id*. at *7.
[57]  *Id*. at *7–8 (internal quotation marks omitted).
[58]  Doc. 27 at 4.

13

sought coverage from the relevant insurer for the "new" claims—namely, the "claims of retaliation" based on the officer's prior suits.[59] In that sense, the circumstances in *City of Maplewood* align directly with those here. Second, Williamsport highlights that unlike the 2017 and 2018 suits it resolved via settlement, the 2004 claims in *City of Maplewood* "did not reach adjudication on the merits."[60] But Williamsport offers no argument for why this factual distinction would compel a different reading of the analogous insurance policy language and therefore a different result. Indeed, this Court finds that it does not.

Here, the relevant policy language is unambiguous: the Charter Oak policy does not cover claims or suits filed within the coverage period if a separate suit involving "related" wrongful employment practice offenses was "first made or brought" prior to the coverage period.[61] Given the policy's broad definition of "related wrongful practice offenses," Helm's 2017 and 2018 suits qualify as "related" to his 2021 claims. And as the 2017 and 2018 suits were "first brought or made" prior to the Charter Oak coverage period, Helm's 2021 suit does not trigger coverage. As such, the Court finds that Charter Oak has no duty to defend the City against Helm's 2021 lawsuit.

---

[59]   2012 WL 2838219 at *6.
[60]   Doc. 27 at 4.
[61]   *See* Doc. 1-4, Ex. 4 (Charter Oak Policy) at 31–40.

### 2.    State National

One might think that because Helm's 2017 and 2018 suits are considered "related" to his 2021 claims, thereby absolving Charter Oak of its duty to defend Williamsport, the prior suits would necessarily compel coverage by State National, Williamsport's public entity liability insurance provider from January 2016 through December 2018.[62] But that is not the case. The determination of whether an insurer has a duty to defend an insured is predicated solely on the terms of that insurer's policy; the broad terms contained in one insurer's policy have no bearing on a separate insurer's coverage obligations.[63] Accordingly, the Court must assess State National's policy on its own terms and determine whether Helm's 2021 claims fall within the scope of this policy. The Court has done so and finds they do not.

As discussed, State National's public entity liability insurance policy provides that State National will "pay on behalf of [Williamsport] all 'loss' resulting from 'employment practices wrongful act(s)' but only with respect to 'claims' first made against [Williamsport] during the 'policy period.'"[64] The policy

---

[62]  Indeed, based on State National's briefing on the instant motions, it appears State National may have held this position. Quoting Williamsport's Complaint, State National argues only that "because the claims in [Helm's 2021 suit] are new claims, unrelated to the previous litigation [i.e., Helm's 2017 and 2018 suits]," they do not trigger coverage under the State National policy. Doc. 24 at 13. State National does not address how its policy interacts with Charter Oak's—specifically, whether a finding, under Charter Oak's policy, that the Helm's 2017 and 2018 suits are related to his 2021 claims necessarily triggers coverage under the State National policy. *See id.*

[63]  *See Allen*, 692 A.2d at 1095.

[64]  Doc. 8-1, Ex. A (2016 State National Policy) at 109.

also enumerates several exclusions, explaining that State National "will not be obligated to make any payment nor defend any . . . future 'claims' arising out of any pending or prior litigation or hearing."[65] Unlike the Charter Oak policy, the State National policy neither defines nor qualifies the term "first made," leaving unaltered its absolute exclusion of "future claims."[66]

This language is clear and unambiguous: State National's coverage obligations extend only to claims first made against Williamsport during the policy period; claims brought after the coverage period—even those that arise out of pending or prior litigation first brought during the coverage period—do not trigger coverage.[67] And here, Helm's 2021 lawsuit was filed on April 15, 2021—more than sixteen months after the policy period of the last issued State National policy expired.[68] Per the terms of State National's policy, Helm's 2021 lawsuit constitutes a "future claim[]" for which State National is not "obligated to . . . defend."[69] That the 2021 lawsuit arose out of Helm's 2017 and 2018 suits (which were filed within State National's coverage period) is of no consequence: the State National policy disclaims coverage for even those future suits "arising out of any pending or prior litigation."[70]

---

[65]   *Id.* at 109–10.
[66]   *Id.* (internal quotation marks omitted).
[67]   *Id.*
[68]   *See* Doc. 24 at 13.
[69]   Doc. 8-1, Ex. A (2016 State National Policy) at 109–10 (internal quotation marks omitted).
[70]   *Id.*

### B.    Duty to Indemnify

Separately, Williamsport asks the Court to rule that the Defendants have a duty to indemnify Williamsport against Helm's April 2021 claims.[71] But this the Court cannot do. The duty to defend is broader than the duty to indemnify, and, therefore, if an insurer has no duty to defend, it likewise has no duty to indemnify.[72] Because the Court finds that neither Charter Oak nor State National must defend Williamsport from Helm's April 2021 claims, neither Defendant must indemnify Williamsport for these claims.

## IV.    CONCLUSION

The City of Williamsport has maintained public entity liability insurance without interruption since 2016. As such, it is reasonable for Williamsport to believe that although it switched insurance providers in 2018, at least one of the insurers would be obligated to defend and indemnify it against Helm's 2021 claims. But that is not the case. Based on the distinct terms of Charter Oak's and State National's insurance policies, neither insurer is required to cover the expenses associated with Helm's lawsuit. The City's motion for judgment on the pleadings is therefore denied; Charter Oak's and State National's cross motions are granted.

---

[71] Doc. 15 at 7, 10.

[72] *See Sapa Extrusions, Inc. v. Liberty Mutual Insurance Co.*, 939 F.3d 243, 250 (3d Cir. 2019) (citing *Kvaerner*, 908 A.2d at 896 n.7; *Ramara, Inc. v. Westfield Insurance Co.*, 814 F.3d 660, 673 (3d Cir. 2016)).

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge